**Margaret H. WRIGHT, Plaintiff–Appellant,**

v.

**ILLINOIS DEPARTMENT OF CHILDREN & FAMILY SERVICES, et al., Defendants–Appellees.**

No. 93–3359.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1994.

Decided Nov. 21, 1994.

Patricia C. Benassi (argued), Benassi & Benassi, Peoria, IL, for plaintiff-appellant.

William S. Hanley (argued), Thomas H. Wilson, Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, IL, for defendants-appellees.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Margaret Wright, a social worker employed by the Illinois Department of Children and Family Services ("DCFS" or "the

Department"), sued the Department and thirteen individual administrators, alleging that various disciplinary actions taken against her and ordered by the defendants violated federal and state law.[1] The district court addressed Wright's various charges in a series of orders, eventually dismissing a number of state law claims (alleging intentional and negligent infliction of emotional distress, defamation, and violations of the Illinois Whistle Blower Protection Act and Illinois Personnel Code) and a claim alleging conspiracy to retaliate for protected conduct in violation of 42 U.S.C. § 1985(2), and granting summary judgment for the defendants on claims brought under 42 U.S.C. § 1983 asserting violations of the First and Fourteenth Amendments. The court also concluded that the individual defendants were entitled to qualified immunity on the federal constitutional claims. Wright appeals the disposition of the First Amendment, conspiracy, and whistleblower claims. We affirm in part, reverse in part, and remand the case for further proceedings consistent with this opinion.

## I.

In 1989, the DCFS[2] first received notice that a five-year old boy, CS, had been sexually abused by his father, JS. At that time, the child's mother had begun private therapy for her son and tried to restrict JS's contact with CS through an appropriate court order. Despite these precautions, the abuse apparently continued, and in February, 1990, the family sought assistance from the DCFS. Margaret Wright served as the intake screener for CS, responsible for reviewing the reported abuse to determine what services should be offered to CS and his family. She was subsequently was assigned to be CS' follow-up case worker.[3]

Wright and her supervisors quickly developed conflicting ideas as to how the case should be investigated and what conclusions should be drawn from the information that had been gathered. Over the course of several months, this conflict degenerated into open hostility—characterized by Wright accusing her supervisors of neglecting abused children and violating state law and the supervisors accusing Wright of perjury and insubordination. Eventually, the Department imposed various disciplinary measures on Wright spawning this litigation.

The voluminous recitations of facts in the parties' respective appellate briefs and the inclusion in appendices of over one thousand pages of reports and affidavits illustrate the contentiousness of this case. As Wright tells the story, the Department willfully ignored credible evidence that CS and his seven-year-old half-sister, NS, were the victims of ritualistic child abuse because they feared that the children's father, JS, would file a lawsuit. Refusing to acquiesce to the Department's position, Wright made efforts to publicize the case, which, she claims, resulted in a campaign of petty harassment against her and the imposition of discriminatory punishment by her superiors. By the Department's version, Wright stubbornly refused to accept the reasoned conclusion that no ritualistic abuse had occurred, and, having lost the internal policy battle, proceeded to orchestrate a concerted and defiant effort to subvert her supervisors' decision in the courts and the me-

1. Wright was terminated on June 11, 1993, and has since filed a separate action, *Wright v. DCFS, et al.*, No. 94–1012 (C.D.Ill.), alleging that the Department's decision to fire her violated the First Amendment.

2. DCFS, a state agency, provides services to children and families, including child protective and child welfare services.

3. Wright had been employed as a social worker in the Bloomington Field Office of the DCFS since 1982 and had compiled an exemplary work record, as evidenced by an uninterrupted string of fine performance evaluations. In late 1986, Wright became union steward of the Bloomington office, and in that role she filed numerous complaints and grievances, bringing her into frequent conflict with her supervisors. Nevertheless, Wright's employment evaluations show no evidence that these activities interfered with her job performance; prior to 1992 she never received an unsatisfactory rating in the category of "human relationships."

dia. As we are reviewing a grant of summary judgment, we are not charged with resolving the numerous disputed factual issues that are referred to below. Our task is to determine whether or not the established facts that are not reasonably open to dispute conclusively indicate that Wright is not entitled to any relief on her claims.

In her role as follow-up case worker, Wright initially reviewed the NS case file and consulted a Chicago police expert before forming a tentative opinion that the type of abuse described by CS was indicative of ritualistic child abuse.[4] Wright reported this suspicion to her supervisors who soon approved her suggestion that the DCFS take custody of NS. With the cooperation of NS's mother (who was divorced from JS), DCFS gained custody of the child and obtained a court order prohibiting contact between NS and JS.

Wright alleges that in determining whether NS actually was a victim of ritualistic abuse the Department neglected to comply with a state law that required it to file a new formal abuse report, to notify JS of the allegations, and to initiate a formal investigation into the accusations. Instead, Wright charges, one of her supervisors, with the knowledge and approval of others in the chain of command, directed that she work with a state police investigator in order to develop a case against JS. No formal report was made and the Department delayed three months before notifying JS of the charges.

JS learned of the allegations on May 11, 1990, and on that day he was shot and severely wounded by Bloomington police officers who confronted him believing that he was on his way to kill NS and her mother, SS. According to Wright, while JS was in the hospital he confessed to a Bloomington police officer that he had killed babies in his kitchen during a satanic ritual. In Wright's view, this confession corroborated CS's earlier statement that he had witnessed such killings. Shortly thereafter, JS's attorney threatened to sue the City of Bloomington for excessive force and the DCFS for unlawfully failing to notify JS of the ongoing child abuse investigation. Wright insists that the credible threat of a lawsuit caused her supervisors to chill the investigation as part of a plan to placate JS and his attorney.

According to the Department, even prior to the shooting the state police investigator with whom Wright had been assigned to work had complained that Wright was conducting interviews on her own. DCFS supervisors advised Wright to cooperate with the agent and to involve him in all of her investigative activities. After the shooting, Wright contacted Bloomington police for an update on JS's condition, at which time she was told of JS's purported hospital room confession. (The Department later found this confession report not credible.) Shortly thereafter a decision was made to remove Wright from any investigative responsibility for the case but allow her to remain involved as a case worker. The Department states that it later received a report that Wright had interviewed people who were connected (albeit marginally) to the shooting incident without notifying the state police. Wright's supervisor then explicitly instructed her to involve one or another of the outside investigators in all subsequent contacts with either the children or their therapist. When the supervisors got wind of Wright's plan to visit the children at a Chicago hospital without either investigator, they relieved Wright of her role in CS's and NS's cases and barred her from making further contact with the children.

According to Wright, both the children and the investigation suffered from her absence as the Department failed to prepare evidence for court appearances and declined to further investigate the substance and accuracy of

---

**4.** CS and NS reported that altars had been used for human sacrifice, people were cut with knives, black persons were beheaded and babies disemboweled. They also described seeing men in black robes and visiting a cave on the Mississippi River where the devil lives. CS further reported that he had seen devils come out of the floor in his father's kitchen and that his father kept the bodies of his victims, the murder weapons, and cages with bats and alligators in a secret room.

JS's bedside confession. The Department insists that it found no additional evidence to corroborate the devil-worshipping accounts provided by the young children. Wright soon took a number of actions to register her protest: (1) she wrote a series of internal memos to her immediate supervisors and to a state-level supervisor; (2) she retained an attorney; and (3) she provided information to a reporter from *People Magazine* who was investigating the case. Wright claims that her local supervisors again harassed her for protesting their decisions, but a state-level supervisor intervened on her behalf, ordering that Wright be reassigned to the NS and CS cases in August, 1990.

Around September, 1990, the Department received a report that BP, a niece of JS, might be at risk because of unsupervised visits with JS. Wright was called to testify in a court proceeding that resulted in the DCFS taking custody of BP. Spurred by these new allegations, the Department asked Mark Pleasant, an experienced investigator from the Lake County Children's Advocacy Center, to conduct a wide-ranging investigation into the controversy over the alleged ritualistic child abuse. Wright strongly disagreed with Pleasant's investigative techniques and his substantive conclusions. Specifically, Wright states that Pleasant refused to cooperate or to share information with her during the investigation, failed to interview numerous witnesses who could have substantiated the ritualistic abuse allegations, and developed an inappropriately friendly relationship with JS and his attorney. In addition, Wright charges that Pleasant wrongly concluded that there had been no ritualistic abuse and circulated his findings—including an accusation that Wright had "subverted justice"—outside the Department in violation of DCFS procedures and state law.

In defending Pleasant's investigation, the Department notes that he interviewed dozens of witnesses and submitted a 250–page report stating his conclusions and underlying reasons. Specifically, Pleasant determined that: (1) there was insufficient evidence to conclude that satanic abuse of JS's children or others had occurred at JS's home; (2) that JS's home nevertheless presented an injurious environment to children because of excessive alcohol and drug use and an apparently open sexual atmosphere; (3) that JS should not be permitted unsupervised access to any child; and (4) that BP's mother, JS's sister, did not knowingly expose her daughter to a risk of harm because she did not believe the allegations of abuse against her brother and was unaware of the atmosphere at his home.

Wright responded by again sending a series of memos up the chain of command objecting to the new "official Department position" that no ritualistic abuse had occurred. In addition, in November, 1990, she submitted a written report to a juvenile court judge informing him of evidence that Pleasant had omitted from his final report (including JS's purported confession at the hospital) and stating reasons for rejecting Pleasant's recommendations. The court, agreeing with Wright, continued the protection order prohibiting contact between CS and JS.

The Department, however, reacted angrily to having its official position contradicted in a document filed with the court by one of its employees, and, according to Wright, her supervisors stepped up their campaign of harassment. In February, 1991, Wright's new supervisor presented her with a notice of disciplinary charges listing three grounds: (1) she had submitted an "unauthorized report" to the juvenile court judge; (2) she had improperly encouraged a client (SS, the mother of one of the abused children) to sue the Department, as evidenced in a letter written to SS's attorney; and (3) she had failed to submit required weekly written reports to her supervisor. Wright tells us that around the same time her supervisor also ordered her, allegedly in violation of DCFS procedures, to remove any references to ritualistic abuse from a court report.

The next flare-up occurred at a March 6, 1991, court hearing in the NS case. JS's attorney called Wright to testify, at which time she stated that no "formal" investigation

of JS had been initiated in February, 1990. She also criticized Pleasant's investigation and accused Pleasant and one of her supervisors of improperly questioning NS about the alleged abuse. Later in the proceedings, a DCFS attorney accused Wright of perjury on the basis of her testimony about the initial stages of the Department's investigation of JS. Immediately after the hearing, Wright was placed on paid administrative leave, told to remain at home during business hours so that she could be contacted, prohibited from having contact with DCFS clients or employees, and ordered to submit to a psychiatric examination.

While on leave, Wright received a written reprimand in resolution of the three charges brought in February and was formally charged with having committed perjury in her March court testimony. This latest charge and Wright's response were submitted to an ad hoc committee of DCFS attorneys and managers. Wright contends that the committee almost completely exonerated her by recommending that her punishment be reduced to a written warning and directing her in-court accuser to notify the court that *he* had misrepresented to the court that Wright had perpetrated a fraud. The Department, on the other hand, insists that the favorable report cited by Wright actually was only a draft prepared by a single member of the committee without any input or comment from the other members.

While still on leave, Wright was subpoenaed to testify in BP's case, at which time she advised the court that her supervisor had ordered her to delete evidence of ritualistic abuse from her final court report. On June 20, 1991, the Department suspended Wright for thirty days. In a four-page statement of reasons, the Department stated that Wright had repeatedly provided inaccurate or misleading information to the court in her March 6 testimony and had failed to obtain supervisory approval when she returned NS to her mother's home. Upon returning to work, Wright was presented with a six-month "corrective action plan." In addition, she contends that she was not given any work for

several weeks and that her previous cases, including the ritualistic abuse cases, were reassigned to other case workers.

Wright filed this lawsuit on September 13, 1991, an action which, she claims, triggered even more retaliation from her supervisors. Two weeks later, she attended another pre-disciplinary proceeding at which time she was charged with improperly keeping a witness fee and falsifying travel activity sheets. The Department immediately dropped the latter charge, but imposed a one-day suspension for the former—a punishment that later was reduced to a written reprimand. Wright protested to no avail that no policy prohibited employees from retaining witness fees collected for testifying on their own time.

In March, 1992, Wright received a draft employment evaluation noting three areas in which her performance needed improvement. One day later that month, Wright returned to her office after hours and encountered several supervisors examining her case files and activity sheets. A month later, the Department again charged Wright with falsification of records. In May, 1992, Wright testified before the Illinois Legislative Task Force on Ritualistic Abuse about the Department's alleged failure to properly address ritualistic abuse cases and retaliation against case workers who did not toe the party line. A day later the Department again placed Wright on a corrective action plan and soon thereafter accused her of violating Department policy by taking compensatory time without supervisory approval. There is no allegation that she ever received any punishment for this charge. However, on July 31, 1992, she was given a one-day suspension for misusing her authority during contact with two local police officers on a matter unrelated to her work duties.

II.

All of the issues raised in this appeal—whether the district court properly dismissed Wright's § 1985(2) and whistleblower claims, whether summary judgment for the defendants was appropriate on the First Amend-

ment claim, and whether the defendants were entitled to qualified immunity—present questions of law that we examine *de novo.* *See Smith v. Fruin,* 28 F.3d 646, 650 (7th Cir.1994). In reviewing dismissed claims, we assume the facts alleged in the complaint to be true, *Northwest Tissue Center v. Shalala,* 1 F.3d 522, 527 (7th Cir.1993), while in reviewing a summary judgment order we view the evidence in the light most favorable to the non-moving party. *Elliott v. Thomas,* 937 F.2d 338, 342 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1242, 117 L.Ed.2d 475 (1992); *see also* Fed.R.Civ.P. 56.

## A.

With respect to the First Amendment claim, the district court's conclusions may be summarized as follows: (1) Summary judgment for the defendants was warranted because the Department's interest in a nondisruptive, harmonious work environment outweighed Wright's interest in speaking as she did in this case; (2) Wright failed to submit specific, nonconclusory allegations that would give rise to a material issue of fact regarding the defendants' mental state—i.e. their motivation—for punishing her; and (3) in any event, the defendants were entitled to qualified immunity because the state of the law was not clear as to what actions by employers, short of discharge, could constitute violations of the First Amendment.

At first glance, it is apparent that even if the district court's conclusions on the difficult questions of degree raised in this case ultimately are sustainable, its reasoning is problematic in at least two respects. First, the district court appears to have lumped together all arguably speech-related aspects of this controversy in order to determine, in one fell swoop, that the Department's interests trumped Wright's under the balancing test articulated in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Board of Ed. of Township High School Dist.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Both *Connick* and our own cases, *see e.g., Knapp v. Whit-*

*aker,* 757 F.2d 827, 845 (7th Cir.), *cert. denied,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985), however, make clear that the proper approach is to apply the appropriate legal standard to each instance of speech for which Wright was allegedly punished to determine its protected status. *Cf. Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1891, 128 L.Ed.2d 686 (1994) (plurality opinion) (noting that the *Connick/Pickering* analysis is to be applied only to speech for which the employee was disciplined). Second, without commenting at this juncture on possible alternative grounds for finding qualified immunity in this case, we note that as of the relevant time period it *was* clearly established in the law that punitive acts short of discharge imposed by public employers in retaliation for an employee's protected speech could give rise to liability for damages. *See e.g., Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). Despite these errors in the district court's analysis, we may, of course, affirm if we conclude based on our own analysis that the defendants are entitled to summary judgment or qualified immunity.

Wright submits that numerous unresolved factual questions render the First Amendment issues in this case unsuitable for summary judgment. Defendants counter that we may resolve this aspect of the case by simply examining two fundamental issues of law: (1) Do the facts at this stage of the proceedings establish a constitutional violation? and (2) Was the wrongfulness of the defendants' conduct clearly established in the law at the time they acted? Defendants correctly identify the relevant two-step inquiry we undertake when a qualified immunity defense has been raised. *See Siegert v. Gilley,* 500 U.S. 226, 231–232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991).

 The determination of whether Wright states a First Amendment cause of action requires us to consider the relevant speech under the standards established by *Connick, Pickering,* and their progeny. Whether a public employee's speech has protected status presents a question of law determined in

the first instance by the trial judge, whose decision we review *de novo*. *See Waters,* ⸺ U.S. at ⸺, 114 S.Ct. at 1884; *Connick,* 461 U.S. at 148 n. 7 & 150 n. 10, 103 S.Ct. at 1690–91 n. 7 & 1692 n. 10; *Marshall v. Porter County Plan Commission,* 32 F.3d 1215, 1219 (7th Cir.1994). We will conclude that a public employee's speech is protected if: (1) it touches upon a matter of public concern, and (2) the employee's interest in expressing herself on this matter outweighs any injury the speech could cause to the State employer's interest "in promoting the efficiency of the public services it performs through its employees." *Waters,* ⸺ U.S. at ⸺, 114 S.Ct. at 1884 (citing *Connick,* 461 U.S. at 142, 103 S.Ct. at 1687; *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734). Our examination proceeds from the long-recognized premise that the government has a freer hand in regulating the speech of its employees than in regulating the speech of the public at large. *See Waters,* ⸺ U.S. at ⸺, 114 S.Ct. at 1886; *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690; *Civil Service Commission v. Letter Carriers,* 413 U.S. 548, 564, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973); *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–35. As the Supreme Court recently explained:

> [T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her.

*Waters,* ⸺ U.S. at ⸺ – ⸺, 114 S.Ct. at 1887–1888. Thus, it is clear that not every utterance by a public employee, even if entitled to First Amendment protection in another context, is constitutionally shielded from employer discipline. *Fruin,* 28 F.3d at 650.

In applying the two-part test, *Waters* and *Connick* tell us to consider only the speech

for which Wright was disciplined. *See Waters,* ⸺ U.S. at ⸺, 114 S.Ct. at 1891; *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. Where, as here, the record of a case contains literally dozens of documents that might arguably be characterized as speech, the court must ferret out those for which punishment may have been imposed to determine if the plaintiff's constitutional rights have been violated. The scope of our inquiry is defined by the number of instances in which the plaintiff has produced "specific, nonconclusory allegations" reasonably linking her speech to employer discipline. *Cf. O'Connor v. Chicago Transit Authority,* 985 F.2d 1362, 1368–1371 (7th Cir.1993) (upholding summary judgment for defendants on the ground that the plaintiff had failed to link his First Amendment activity to his suspension and termination), *petition for cert. filed,* No. 93–5218 (Jul. 12, 1993); *Elliott,* 937 F.2d at 344–346 (finding that defendants were entitled to qualified immunity in advance of discovery where plaintiff had failed to produce "specific, nonconclusory allegations" that defendants sought to punish her on account of her speech). In her appellate briefs, Wright suggests that her employers retaliated for a wide range of her speech activity, including: (1) testifying in court on numerous occasions; (2) testifying before a legislative task force; (3) contacting a reporter from *People Magazine;* (4) associating with her legal counsel; (5) filing a federal lawsuit; (6) communicating with others about abused children; (7) submitting a report in juvenile court; and (8) writing a letter to an attorney who represented SS, the mother of one of the abused children.

We do not doubt that the defendants may have been displeased by some or all of these activities, but, as we noted in *O'Connor,* 985 F.2d at 1369, a plaintiff may not sustain her burden "simply by showing that the elimination of the protected activity may have been welcomed by the defendants," nor can we typically draw strong conclusions from the mere fact that protected speech may have preceded an adverse employment decision. *See Rakovich v. Wade,* 850 F.2d 1180, 1191

(7th Cir.) *(en banc), cert. denied,* 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *cf. Trnka v. Local Union No. 688,* 30 F.3d 60, 63 (7th Cir.1994) ("To stave off summary judgment in a case where innocent or multiple explanations for a defendant's actions abound a plaintiff must rely on more than *post hoc, propter hoc* reasoning."). Defendants do not dispute that Wright has adequately linked her speech to two separate disciplinary actions involving three instances of speech: (1) Wright's submission of a report to a juvenile court judge without first obtaining supervisory approval and her discussion of a potential lawsuit to be filed by SS against the Department (as reflected in Wright's correspondence with SS's attorney) were substantial factors in the Department's decision to issue a written reprimand, and (2) Wright's testimony at a March 6, 1991, court hearing weighed heavily in the Department's decision to impose a thirty-day suspension. However, even when drawing all reasonable inferences in her favor, as we must, we are unable to conclude that Wright has adequately linked any other instances of speech to punishment meted out by the defendants. In her opening brief, Wright states in a conclusory fashion that she has produced direct evidence supporting each of the numerous allegations cited above. Defendants respond that Wright fails to tell us where in the record we may find the essential linkage. Unfortunately for Wright, her reply brief advances her case very little, if at all, on this score. Thus, at the end of the day, we must conclude that Wright has failed to point us toward specific record evidence demonstrating the required connections between employer discipline and any of the additional speech activity listed in the previous paragraph. And we are not going to scour this voluminous record for her.

We are thus left with three instances of speech for which it can be deemed that Wright was punished. To determine whether any of this speech was constitutionally protected, we first must decide whether matters of public concern are involved. If so, we must proceed to the *Pickering* balancing test; if not, our inquiry is complete. *Connick* tells us to resolve the public concern inquiry by scrutinizing the "content, form, and context of a given statement, as revealed by the whole record." 461 U.S. at 147–48, 103 S.Ct. at 1690–91. Our cases since *Connick* are useful in focusing the inquiry, although no hard and fast rules have emerged. We have stated that content is the most important factor, *Yoggerst v. Hedges,* 739 F.2d 293, 296 (7th Cir.1984), though "[t]he speaker's motivation and choice of forum [also] are important because, absent those factors, every employment dispute involving a public agency could be considered a matter of public concern." *Barkoo v. Melby,* 901 F.2d 613, 618 (7th Cir.1990). Even if the subject matter of the employee's speech undoubtedly is one of public interest, "[t]he content and form of the employee's remarks, along with the underlying circumstances, including the employee's reasons for speaking, remain essential to the determination." *Fruin,* 28 F.3d at 651 (citations omitted). For example, if the speech concerns a subject of public interest but the particular statement or expression only impacts personally upon the employee, then as a matter of law the speech is not of public concern. *See Marshall,* 32 F.3d at 1219; *Fruin,* 28 F.3d at 651. To be sure, we have stated that the fact that the speaker has a personal stake in the subject matter of her speech does not necessarily remove the speech from the scope of public concern, *Marshall,* 32 F.3d at 1219; *Breuer v. Hart,* 909 F.2d 1035, 1039 (7th Cir.1990) ("Wrongdoing may often be revealed to the proper authorities only by those who have some personal stake in exposing wrongdoing."), though, at the same time, we have attached some significance to the fact that a public employee's complaints about a subject within the scope of her job responsibilities is not acting simply as a member of the general public. *See Marquez v. Turnock,* 967 F.2d 1175, 1177 (7th Cir.1992); *Egger v. Phillips,* 710 F.2d 292, 316–18 (7th Cir.1983) *(en banc), cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1984). Finally, it also is clear that a public employee speaking as a citizen on a matter of public concern

need not form an organization, call a press conference, or make front-page headlines in order for his speech to merit protection. *See Fruin*, 28 F.3d at 653.

■ If we conclude that a public employee's speech touches on a matter of public concern, we then must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the State's interest, as an employer, in promoting the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. As the Court has observed, appropriately reconciling these competing interests in particularized factual scenarios is a difficult task, *see Connick*, 461 U.S. at 150, 103 S.Ct. at 1691–92, which necessarily belongs to the judicial branch as part and parcel of our authority to determine the meaning and application of the First Amendment. *See id.* at 150 n. 10, 103 S.Ct. at 1692 n. 10 (citing *Pennekamp v. Florida*, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946)). Though often imprecise, this balancing is "necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987); *O'Connor v. Steeves*, 994 F.2d 905, 912 (1st Cir.), *cert. denied*, ___ U.S. ___, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993). Our cases have stated a number of relevant factors that may inform our decision: (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. *See e.g., Glass v. Dachel*, 2 F.3d 733, 742 (7th Cir.1993) (collecting cases containing various statements of the *Pickering* test); *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1258 (7th Cir.1985). Contrary to Wright's assertions, we do not require a showing of *actual* disruption; rather, we look to the "ordinary or foreseeable effect of the conduct in controversy ... to determine whether it would be 'reasonably calculated to create division or to have impaired discipline.'" *Patkus*, 769 F.2d at 1258. In the three subsections that follow, we apply the foregoing principles to the speech at issue in this case.

1.

■ We first consider whether a four-page report prepared by Wright on November 19, 1990, and submitted to the juvenile court in connection with the CS case constituted protected speech. In that report, Wright details her version of the procedural and substantive shortcomings of the Department's official investigation of the case. Both the subject matter and specific content of Wright's report—a critical review of the State's methods of investigating an allegation of child abuse—raise issues of public concern. *See Greenberg v. Kmetko*, 811 F.2d 1057, 1062 (7th Cir.1987), *aff'd in part, vac. in part*, 840 F.2d 467, 474 (7th Cir.1988) (*en banc*) (electing not to disturb the vacated panel's findings that the plaintiff's comments qualified as protected speech); *see also Glass*, 2 F.3d at 741 (noting that plaintiff's comments about whether his supervisor had stolen a lawn mower and whether any departmental investigation would have been adequate can be fairly characterized as touching on matters of public concern). As in *Greenberg*, Wright's report attempted to publicize perceived neglect of the state's responsibility to protect children about whom credible evidence of abuse has been received. In addition, though we do not consider voluntarily submitting a report to a court to be fully on par with giving sworn testimony, *see infra* at 1505, we are of the view that the forum in which Wright chose to present her qualms

about the Department's activities "lends a public air to the form of these complaints." *Breuer,* 909 F.2d at 1038.

At the same time, however, especially in light of the uncontroverted evidence that Wright and her supervisors had been at odds over this case from its inception, we find that Wright, quite naturally, had both personal and professional motives for submitting the report. By the time that Wright filed the report, the Department had largely rejected her view of the case and, indeed, had summoned an outside investigator (whose conclusions Wright disputed) to help resolve the issue once and for all. It is clear that Wright wanted to be involved in the case, had greatly invested her efforts and reputation in it, and had quite a stake in things being perceived and done her way. Even more generally speaking, as in *Marquez,* it would be difficult to conclude that Wright was acting "simply as a member of the general public" in authoring and submitting this report; "it was [her] *job* to investigate such violations and make recommendations as to the appropriate response." 967 F.2d at 1178–79. This fact, we found in *Marquez,* tended to support a finding that the plaintiff was speaking more to an internal matter within the workplace, though it might also be argued that misconduct of the kind alleged by Wright is unlikely to be uncovered by persons who are not intimately connected with the underlying events. *Cf. Breuer,* 909 F.2d at 1039.

Obviously, the various criteria employed to determine whether a particular instance of speech touches on a matter of public concern seldom point exclusively in one direction. Thus, in the usual case the process by which we sort, weigh, and draw a conclusion from the evidence is, at best, something of an inexact science. Here the content and form of the report strongly indicate its "public concern" character and, in our view, outweigh opposing considerations stemming from Wright's intimate personal involvement with the case.

Nevertheless, in the particular circumstances presented here, we believe that the report is unprotected under *Pickering.* Though, as in *Patkus,* we cannot dispute that "it may have been proper, or even necessary, for [Wright] to raise questions about an investigation that [in her view] was not being conducted properly," 769 F.2d at 1258, the *Pickering* calculus requires us to consider whether the authorities to whom she appealed were the appropriate recipients of such communication, *id.* (citing *O'Brien v. Town of Caledonia,* 748 F.2d 403, 407 (7th Cir.1984)), and whether and to what extent the way in which she chose to present her protest may have disrupted the effective functioning of her office. *Id.* (citing *Clark v. Holmes,* 474 F.2d 928, 931 (7th Cir.1972) (per curiam)), *cert. denied,* 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973). In addition, we have observed that "additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer" when the speaker is directly involved in or affected by the issue being discussed. *Patkus,* 769 F.2d at 1258 (citing *Connick,* 461 U.S. at 153, 103 S.Ct. at 1693; *O'Brien,* 748 F.2d at 407).

In this case, the Department reprimanded Wright for "[k]nowingly submitting a report to the court on the CS case without obtaining prior supervisory approval," in violation of Regional and Field Office policy. In response, Wright does not dispute that she violated department policies; rather, she defends by saying that reports often were submitted without approval. Assuming that Wright is correct, the Department still had the authority to crack down here. Wright could (and did) appeal the decisions of her supervisor to higher authorities within the Department, and, in fact, benefitted from a state supervisor's decision to overrule his local subordinates' decision to remove Wright from an earlier related investigation. However, once her superiors, in the exercise of their discretion, decided to appoint an outside investigator, to accept his conclusions, and to submit them to the court as the Department's position, any further objection Wright had to those conclusions should have been expressed within the chain of command

and according to office policy. Her unilateral decision to submit a report to the court is analogous to a junior prosecutor's decision to undercut the legal position adopted in his employer's—the government's—brief by filing a separate, personal brief confessing error. In both circumstances, the relevant departmental decisionmakers have a responsibility to use their judgment in choosing an official position to represent and defend to the court, and may reasonably expect that their judgment will not be sideswiped by an independent submission to the court by a subordinate who fought and lost the internal policy battle but still hopes to win the war. In discharging their important duties, state agencies rely upon unified chains of command through which disparate sources of information may be filtered and evaluated in the process of reaching and executing difficult, and often controversial, decisions. Vigorous debates within the agency, even at the eleventh-hour, are to be expected, but at a certain point the department's position must be set firmly if the department is to function. Agency decisionmakers may then punish thirteenth-hour efforts to undermine their authority and disrupt the functioning of their offices by subordinates seeking to undercut final decisions with which they disagree. Of course, the balance may have shifted decisively if Wright had followed authorized procedures, appealed to more appropriate authorities, or perhaps shown a wilful lack of investigation on the part of her superiors. However, on the facts presented here, we conclude that the Department's interests in maintaining discipline within its ranks, insuring harmony among co-workers, and enforcing its policies with respect to contact between the Department and the judiciary outweighed Wright's interest in communicating her concerns about the investigation to the court. This conclusion does not mean, however, that a state statute may not authorize what Wright did, or at least bar the state from punishing her for it. Rather, it simply recognizes that the *First Amendment*, in this instance, provides neither a shield against the defendant's actions nor a sword with which to pierce the defendants' wallets.

### 2.

■ We turn next to the question of whether Wright's letter to the attorney representing SS, the mother of one of the abused children, chronicled protected speech. The content of this letter overlaps significantly with the report we considered above in that both include lengthy descriptions of Wright's concerns with the Department's investigation. There are, however, additional features of this letter that lead us to entertain serious doubts as to whether it addresses a matter of public concern. About half of the letter provides background information to the attorney—a description of attached documents, a listing of the "players" in the case, and a few paragraphs summarizing actions that Wright already had taken in the case—while the remainder of the letter details "[f]or whatever interest it is or is not to you" Wright's concerns about the investigation. In the first half of the letter, Wright mentions that she has spoken with the attorney's client who "is interested in suing the Department and mentioned asking if you were interested in that. I suggested to her that we slay one dragon at a time." In our view, the second half of the letter speaks to a matter of public concern while the first half might be viewed as having a more personal or private character, both in substance and motivation. On the whole, then, on which side of the *Connick* line the document falls is a close question.

Even if the letter does speak to a matter of public concern, however, the *Pickering* balance again tilts in favor of the defendants. Wright was punished for indicating in the letter that she was "encouraging the client to sue the Department" and failing to encourage the client "to utilize the Department's Service Appeal System to address problems that she was having with the Department." Wright claims that the Department misinterpreted her comment, and that, in fact, she was trying to prevent a lawsuit. It is not our role to definitively resolve the meaning of Wright's suggestion to SS that "we slay one dragon at a time." It is enough to say that the reasonable inferences to be drawn from

the comment raised a legitimate concern that Wright might be inappropriately involved in encouraging a lawsuit against the Department. In the circumstances, the Department's interests in maintaining discipline within the agency and fostering trust and harmony between supervisors (the most likely defendants in the contemplated action) and their subordinates outweighed Wright's interest in commenting on (and perhaps advocating) prospective litigation against her current employers and justified the decision to reprimand Wright for appearing to have done so.

### 3.

Finally, we must determine whether the defendants violated the First Amendment in punishing Wright for her March 6, 1991, testimony in the NS case. Drawing on Fifth Circuit cases, Wright suggests that we ought to conclude that an employee who testifies before an official government adjudicatory or fact-finding body speaks in a context that is inherently of public concern. *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1578 (5th Cir.1989) (citations omitted); *see also Ziccarelli v. Leake*, 767 F.Supp. 1450, 1455 (N.D.Ill.1991). Although we share our colleagues' concern for the integrity of the judicial process, our cases have rejected a blanket rule according absolute First Amendment protection to communications made in the course of a lawsuit. *See Belk v. Town of Minocqua*, 858 F.2d 1258, 1261–62 (7th Cir.1988) (declining to hold as a matter of law that the fact that the Town Board may have terminated Belk in retaliation for threatening to file a grievance constitutes a *per se* violation of the First Amendment without regard to content); *Yatvin v. Madison Metropolitan School Dist.*, 840 F.2d 412, 419–20 (7th Cir.1988) (concluding that Yatvin's lawsuit does not come within the protection of the First Amendment because, among other reasons, it was not filed to correct allegedly unlawful practices or to bring them to public attention). Such a rule would contravene both the rationale of cases like *Connick* and *Pickering* that public employee speech is protected against employer retaliation only if it addresses matters of public concern and the premise of *McDonald v. Smith*, 472 U.S. 479, 484–85, 105 S.Ct. 2787, 2790–91, 86 L.Ed.2d 384 (1985), that there is no sound basis for granting greater constitutional protection to statements made under the Petition Clause than to other run-of-the-mill speech or expression. In short, airing private gripes in the form of a complaint or testimony cannot alter their status as private gripes.

Here, as in *Yatvin*, 840 F.2d at 420, we need not decide precisely when a lawsuit (or testimony offered therein) comes within the protection of the First Amendment. It is sufficient to note that Wright's testimony was similar in content to the report discussed in section II.A.1—a report which we found to have touched on a matter of public concern. *See supra* at 1503. Adding the *Pickering* factors to the calculus, surely an employee summoned to give sworn testimony in a judicial proceeding has a compelling interest in testifying *truthfully* and the government employer can have an offsetting interest in preventing her from doing so only in the rarest of cases. Thus, truthful testimony on matters of public concern normally is protected speech, and, moreover, qualified immunity is not available to a defendant who knowingly punishes an employee for uttering such speech on the basis of cases like *Johnston, supra,* and *Reeves v. Claibourne County Board of Education*, 828 F.2d 1096 (5th Cir. 1987). On the other hand, if an employee has presented false testimony both sides of the *Pickering* balance may be significantly altered. *See Steeves*, 994 F.2d at 916 n. 8. As the First Circuit has recognized, "an employer has a greater interest in curtailing erroneous statements than correct ones, and still a greater interest in curtailing deliberate falsehoods," and "[c]orrespondingly, an employee's interest in making public statements is heightened according to their veracity." *Id.* (citing *Brasslett v. Cota*, 761 F.2d 827, 839 (1st Cir.1985)). Following from this analysis, it would be proper for a court to further distinguish between negligent inaccu-

racies and malicious falsehoods for purposes of applying the *Pickering* test.

■ In this case, the Department suspected that Wright had at least misled the court, if not committed outright perjury. Whether Wright did, in fact, commit perjury "is a matter for the Department to work out as an original matter, and then perhaps for a court hearing on an action under state law." *Feldman v. Bahn*, 12 F.3d 730, 733 (7th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 571, 130 L.Ed.2d 489 (1994); *see also Waters*, —— U.S. at ——, 114 S.Ct. at 1890 ("an employee may be able to challenge the substantive accuracy of the employer's factual conclusions under state contract law, or under some state statute or common-law cause of action.... But this protection is not mandated by the Constitution."). The question before us—whether the defendants were justified in disciplining Wright on the basis of her testimony—does not directly hinge on the accuracy of her utterances because *Waters* makes clear that employees may not recover in damages from employers who make reasonable mistakes. —— U.S. at ——, 114 S.Ct. at 1890 (plurality opinion); —— U.S. at ——, 114 S.Ct. at 1893 (Souter, J., concurring) (explaining why lower courts should apply the reasonableness test as stated in the plurality opinion). Put differently, if Wright's supervisors reasonably believed, after an adequate investigation, that her testimony was false, even if it actually was true, they could punish her on the basis of their investigation. *See Waters*, —— U.S. at ——, 114 S.Ct. at 1889 (stating that the *Connick/Pickering* test is to be applied by the court to "the facts as the employer reasonably found them to be"). In this case, we believe that the truth or falsity of Wright's testimony would be the decisive factor in the *Pickering* balance—thus, the defendants must prevail if they actually believed that Wright's testimony was false or misleading,

and if their conclusion was the product of "the care that a reasonable manager would use before making an employment decision." *Id.*[5]

When defendants imposed the suspension they gave a four-page statement of reasons that appears in the record. Wright disputes the accuracy and sincerity of the defendants' stated reasons and points specifically to another document in the record which she claims is a prior report authored by an ad hoc investigatory committee of DCFS officials (including her immediate supervisor) assigned to investigate the charges against her. That committee's final report, she insists, vindicates her version of the events and establishes the truthfulness of her testimony. Defendants counter that this "report" was simply a draft, written by a single committee member without the assistance or approval of his colleagues. Beyond the face of the document itself (which we find wholly ambiguous), the only evidence offered by defendants to support their characterization of the report is a single notation in defendant Baechle's file notes contained at page 1041 of the plaintiff's appendix. Defendants state in their brief that the committee actually recommended the exact punishment that the Department ultimately imposed—a thirty-day suspension—though they cite nothing in the record that explains either the process by which the committee rejected the draft or the process by which the ultimate decisionmakers accepted the purported final conclusion of the committee.

Viewing the evidence in the light most favorable to Wright, we find that she has adequately raised a question about the genuineness of the Department's asserted permissible justification for the suspension—namely, that they reasonably believed her speech to be unprotected. In view of the undisputed evidence of rancor and acrimony between Wright and her supervisors and the fact that

5. We recognize, of course, that the matter to be investigated in *Waters* was what the employee actually said while in the instant case we know exactly *what* Wright said in her testimony and the issue for investigation is the proper characterization (true, negligently incorrect, or maliciously false) of that speech. This distinction is unimportant, however, because here, like in *Waters*, the protected nature of the speech hinges not on its objective characterization but on the employer's subjective reaction to it.

the ad hoc committee's pro-Wright determinations were at hand but seemingly discounted for no undisputably innocent reason, we cannot say, on the record as it now stands, that no reasonable jury could find that the defendants suspended Wright in order to punish her for speech they recognized as truthful.[6] Accordingly, we must conclude that this issue survives summary judgment. At the same time, however, it is also possible that additional factual information will show either that the purported "exoneration" was reasonably rejected either by the committee itself, or by the Department's ultimate decisionmakers. After allowing adequate time for discovery and briefing on the matter, the district judge may still enter judgment for defendants if he concludes that no reasonable jury could doubt that the defendants reasonably believed, after adequate investigation, that Wright's testimony was misleading or false, even if their belief, though honestly held, was erroneous. Alternatively, the district judge may enter judgment for the defendants if he resolves in their favor a difficult constitutional question we leave open today: whether Wright's testimony actually was protected speech. In addition, although it is premature to decide whether the defendants are entitled to qualified immunity— surely they are not if they actually believed that Wright's testimony was truthful—we note that the issue remains open to consideration on remand. If, on the other hand, the court submits the case to a jury and the jury concludes that Wright's punishment was at least in part impermissibly motivated, the defendants may prevail only if they can show that Wright would have been suspended anyway for reasons unrelated to her speech. *See Cromley v. Bd. of Educ. of Lockport H.S.D. 205,* 17 F.3d 1059, 1067–69 (7th Cir. 1994) (relying on *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471

(1977)), *cert. denied,* —— U.S. ——, 115 S.Ct. 74, 130 L.Ed.2d 28 (1994).

### B.

Wright next asserts that the district court erred in dismissing Count III of her Second Amended Complaint alleging a violation of 42 U.S.C. § 1985. As indicated by the memorandum she filed in opposition to the defendants' motion to dismiss, Wright specifically claims that the defendants conspired to deny her access to federal court in violation of § 1985(2). Section 1985(2) contains two clauses that give rise to separate causes of action pertaining to access to federal and state or territorial courts. While a plaintiff must allege class-based animus to state a claim for denial of access to state courts, *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971), no such requirement exists for an action asserting denial of access to federal courts. *Kush v. Rutledge,* 460 U.S. 719, 726, 103 S.Ct. 1483, 1488, 75 L.Ed.2d 413 (1983). Perhaps because she cannot satisfy the demands of *Griffin,* Wright argues only that defendants have violated the first clause, under which a plaintiff establishes a claim upon a showing of four elements: (1) a conspiracy by the defendants; (2) to injure a party or witness in his or her person or property; (3) because he or she attended federal court or testified in any matter pending in federal court; (4) resulting in injury or damages to the plaintiff. 42 U.S.C. § 1985(2); *see also Portman v. County of Santa Clara,* 995 F.2d 898, 909 (9th Cir.1993) (citation omitted). As with her First Amendment claims detailed above, Wright alleges numerous instances of threats made and punishments imposed in retaliation for retaining counsel and filing a federal lawsuit, all of which, for present purposes, we must accept as true because the

---

6. *Waters* provides little direct guidance as to the division of labor between judge and jury in a case like this one. *See* —— U.S. at ——, 114 S.Ct. at 1897 (Scalia, J., concurring in the judgment) (describing the ambiguity of the plurality opinion in this regard). As noted above, it is clear that the court itself must undertake the weighing and

balancing required by *Connick* and *Pickering,* and, indeed, we have done so here, concluding that; except in the rarest of cases (which this is not), truthful testimony is protected speech. The critical question that, to this point, remains unanswered requires an assessment of the defendants' subjective motivation, a classic jury issue.

district court dismissed her § 1985(2) claim on the basis of the so-called intra-corporate conspiracy doctrine recognized in *Dombrowski v. Dowling,* 459 F.2d 190, 196 (7th Cir. 1972) (Stevens, J.), and recently reaffirmed in *Travis v. Gary Community Mental Health Center,* 921 F.2d 108, 109–11 (7th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991).

As we emphasized in *Travis,* the essential holding of that case and *Dombrowski* "is that managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." 921 F.2d at 110. We then considered and rejected a number of proposed limitations on the reach of the doctrine. First, we determined that there was no sound basis for not applying the same approach to all of the various subsections of § 1985. Second, we noted that a corporation's consultation with outside counsel before undertaking to fire the plaintiff did not generate a conspiracy where one otherwise would not have existed because the ultimate decision was affected by a single economic entity. Finally, in view of § 1985's focus on "multiple act*ors,* not on multiple *acts,*" *id.* at 111, we rejected the notion that corporate managers become conspirators because they engaged in more that one discriminatory or retaliatory act. *See also Hartman v. Bd. of Tr. of Com. College Dist. 508,* 4 F.3d 465, 470 (7th Cir.1993).

*Travis* did not, however, address the question squarely presented in this case—namely, whether the rationale of *Dombrowski* can be extended to bar a § 1985(2) claim against individual members of a single *government* entity. In *Hartman,* we answered in the affirmative, at least to the extent that the plaintiff "does not claim that the conspiracy was part of some broader discriminatory pattern ... or that it in any way permeated the ranks of the organization's employees." 4 F.3d at 470–71 (holding that an alleged agreement by the superiors of an employee of a public colleges organization was not a conspiracy within the meaning of § 1985).

Other courts similarly have concluded that the doctrine is not restricted to private entities. *See Hull v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505, 509–10 (6th Cir.) (holding that the employees and agents of a public school board are members of the "same collective entity" and therefore are not separate "persons" who may form a conspiracy within the meaning of § 1985), *cert. denied,* 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991); *Doe v. Bd. of Educ. of Hononegah School Dist. 207,* 833 F.Supp. 1366, 1381–1382 (N.D.Ill.1993) (holding that the intracorporate conspiracy doctrine barred § 1985(2) claim against public school administrators who allegedly agreed with each other and with school counselors to disregard state law requirement that they report allegations of sexual abuse to the Department of Children and Family Services); *Allen v. City of Chicago,* 828 F.Supp. 543, 564 (N.D.Ill.1993) (holding that the mayor, a city commissioner, and various unnamed members of the city council, all members of same municipal corporation, are not separate persons capable of conspiring with each other for the purposes of § 1985). We believe that large bureaucratic agencies such as the DCFS are functionally the equivalent of corporations in that their employees and officials jointly endeavor to provide a product or service and reach decisions pursuant to a unified, hierarchical structure. In other words, to borrow the language of *Dombrowski* and *Travis,* the Department can be said to constitute only a single "center[ ] of social or economic influence." 921 F.2d at 110; 459 F.2d at 196. As such, we find that the defendants here, as members of the same collective entity, are similarly situated to the defendants in *Hartman.* As in *Hartman,* the conspiracy alleged in the instant case had a rather limited object—stifling Wright's effort to air her personal and professional grievances—and, although its purported membership was greater—thirteen officials as opposed to two—there has been no allegation of the kind that the *Hartman* panel suggested might require us to disregard the doctrine. *See* 4 F.3d at 470–71. In sum, then, except in egregious circumstances, intra-entity discussions that

result in discriminatory or retaliatory actions lie outside the scope of § 1985. Finding no such circumstances alleged here, we affirm the dismissal of Wright's § 1985(2) claim.

### C.

Finally, Wright alleges that the district court erred in dismissing her claims brought under the Illinois Whistle Blower Protection Act, 5 ILCS 395/1 and the Illinois Personnel Code, 20 ILCS 415/19c.1. The court properly dismissed the former claim because the protection of § 395/1 extends only to employees of constitutional officers. At the same time, however, we find that the court erroneously dismissed the latter claim on the grounds that 42 U.S.C. § 1983 provided an adequate alternative remedy. As we indicated above, states may provide protections to employees that parallel or even exceed those provided by federal law. Illinois, in fact, encourages in many circumstances reports of crime, mismanagement, abuse of authority and the like and forbids employers to retaliate against employees who make such reports. *Gooden v. Neal*, 17 F.3d 925, 929 (7th Cir.1994) (citing, *inter alia*, 20 ILCS 415/19c.1), *cert. denied*, — U.S. —, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994). As we noted in *Gooden*, a state law claim alleging wrongful retaliation and a federal claim based on the First Amendment raise distinct legal theories; Wright could win under one and lose under the other. *Id.* Accordingly, we reverse the dismissal of Wright's claim brought under 20 ILCS 415/19c.1.

### III.

For the foregoing reasons, the judgment of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.