Ronnie B. GREER, Plaintiff,

v.

Debra H. AMESQUA, Individually and in her capacity as Fire Chief of the City of Madison, Wisconsin, Alan Seeger (In his individual and official capacities), Margaret MacMurray (In her individual and official capacities), Byron Bishop (In his individual and official capacities), Lynn Hobbie (In her individual and official capacities), Mario Mendoza (In his individual and official capacities), The City of Madison Fire Department, the City of Madison, the City of Madison Police & Fire Commission, and ABC Insurance Company, Defendants.

No. 98–C–0560–C.

United States District Court,
W.D. Wisconsin.

Sept. 25, 1998.

Michael Dean, Michael Dean & Associates, Waukesha, WI, for Greer, Ronnie B., plaintiff.

Michael J. Modl, Axley Brynelson, Madison, WI, for Amesqua, Debra H., Seeger, Alan, Macmurray, Margaret, Bishop, Byron, Hobbie, Lynn, Mendoza, Mario, The City of Madison Fire Dept., The City of Madison, The City of Madison Police & Fire, defendants.

## OPINION AND ORDER

CRABB, District Judge.

█ Two Supreme Court decisions, *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), establish a principle that a public employee is entitled to First Amendment protection for speech that is a matter of public concern provided that the employee's interest in expressing a view on the subject outweighs the harm to a public employer that can result when an employee speaks his or her mind. *Connick* and *Pickering* recognize that the public employee's free speech rights and the public's interest in having public employees speak out on the operations of government must be balanced against the need of public employers to maintain order in the workplace so as to be able to serve the public effectively and efficiently.

Plaintiff Ronnie B. Greer was discharged from his position as a City of Madison firefighter because of statements he made about the fire chief and another command officer in a self-styled "news release" entitled "Homosexual Chief rewards Homosexual Chief for Assault?" Plaintiff contends that his discharge violated the First Amendment because under *Connick* and *Pickering,* his news release was a matter of public concern and his free speech interests outweighed any injury to the interests of the fire department. Asserting that the harm to his First Amendment rights is irreparable, plaintiff seeks an injunction requiring his immediate reinstatement.

The request for preliminary injunctive relief will be denied because plaintiff has not shown that he is likely to succeed on the merits of his claim, which is one of the threshold burdens he must meet to be entitled to preliminary injunctive relief. The news release discusses alleged favoritism by the chief toward another command officer because of allegedly shared personal and professional beliefs and sexual orientation. Although defendants contend that plaintiff's news release must be viewed as just part of an "ongoing dispute" plaintiff has with the fire chief, the factual record is too undeveloped at this stage to justify such a conclusion. Because official wrongdoing of the sort alleged in the news release is a matter traditionally recognized to be of public concern, for the sole purpose of determining whether plaintiff is entitled to preliminary injunctive relief, I find that the news release raises a matter of public concern.

█ However, *Connick* and *Pickering* establish that even when a public employee speaks out on a matter of public concern, the speech may jeopardize working relationships among public employees and impair the delivery of governmental services. Thus, the public employer's interest in taking action

against the employee may outweigh the employee's free speech rights. I conclude that defendants are likely to show that the fire department has a strong interest in controlling firefighters who make public challenges to the decision making of the chief and speculate publicly about the sexual orientation of command officers and that this interest outweighs plaintiff's free speech interests embodied in his news release. Because of the strong probability that defendants will be able to show that the department's interests outweigh plaintiff's, I conclude that plaintiff has not met his threshold burden of demonstrating a likelihood of success on the merits of his First Amendment claim.

Before turning to the facts and legal analysis, it is necessary to address several issues concerning the scope and nature of proceedings before this court and the evidentiary record. Under Wisconsin law, a person disciplined by a police and fire commission is entitled to judicial review of the commission's decision. *See* Wis. Stat. § 62.13(5)(i). Plaintiff's right to have his discharge reviewed in state court has had two effects on this litigation so far. First, it underlies defendants' arguments that, pursuant to *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), this court should abstain from ruling on plaintiff's motion for a preliminary injunction to avoid interfering with ongoing state proceedings and that disputes concerning plaintiff's discharge are not yet "ripe" for Article III purposes. However, the ten-day time limit in which plaintiff could have sought state court judicial review has expired. At the August 18, 1998, hearing in this matter, plaintiff stated that he had abandoned his right to such review. Therefore, there is no need to consider defendants' *Younger* abstention and ripeness arguments.

■ Second, plaintiff's right to state court review has influenced the parties' evidentiary presentations and legal arguments. Plaintiff devotes attention to alleged errors in the commission proceedings. Defendants assert that the commission's decision is well-supported. If the parties believe that this court will review the commission's decision in the same manner that a state court would under Wis. Stat. § 62.13(5)(i), they are wrong. The

issue before this court is whether plaintiff's discharge violated the Constitution, not whether it comported with state law. There will be no opportunity for the parties to retry matters heard by the commission. Arguments to that effect have been disregarded.

Next, the constitutional issues material to plaintiff's motion for preliminary injunctive relief must be identified. This action is brought pursuant to 42 U.S.C. § 1983. The complaint alleges three causes of action: 1) violation of plaintiff's First Amendment rights resulting from his discharge for statements made in the news release; 2) denial of plaintiff's right to due process of law in the hearings leading to his discharge; and 3) violation of plaintiff's equal protection rights when other firefighters who committed more serious infractions received lighter sanctions. Plaintiff contends that each of these three causes of action warrants injunctive relief requiring his immediate reinstatement, but at the hearing in this matter he conceded that the sole harm to be remedied by his immediate reinstatement is the alleged infringement of his First Amendment rights. He contends that an award of back pay and reinstatement after trial could not compensate him for the interim harm to his First Amendment rights. From plaintiff's concession, it is apparent that his due process and equal protection claims are not material to his current request; any violation of those rights may be remedied with back pay and reinstatement after trial. Plaintiff's motion for preliminary injunctive relief will be confined to his contention that his news release was protected by the First Amendment and that it was unconstitutional for the department to discharge him for issuing it. Whether commission proceedings violated his due process rights and whether discharge was disproportionately severe in violation of equal protection principles are matters reserved for consideration at a larger stage of this litigation.

■ Finally, the sources of the factual findings must be discussed. In support of his motion for a preliminary injunction, plaintiff has proposed findings of fact that are supported by a few affidavits and numerous exhibits that were used in the commission

proceedings. Defendants have filed a response to plaintiff's proposed findings of fact in which they refer to affidavits filed in this court as well as to plaintiff's exhibits. This court's Procedure to be Followed on Motions for Injunctive Relief contemplates that only evidence that is the subject of a proposed finding of fact will be considered in the analysis. *See* Procedure to be Followed on Motions for Injunctive Relief, ¶¶ II.A.2, III.A.2 (movant's and respondent's obligations). Although no party has indicated that the process of submitting proposed findings of fact is inadequate and that an evidentiary hearing is necessary, plaintiff and defendants both discuss evidence in their briefs that is not the subject of a proposed finding of fact. I understand them to be extending an invitation to the court to review and consider the bulky exhibits and affidavits that are outside the proposed findings of fact and make findings from the record as a whole. This court's procedure makes clear that such invitations will be declined. *See id.* ¶ III.C (*"This court does not consider that it is under any obligation to search the record for factual matters that might support either the grant or the denial of the motion."*).

Plaintiff's proposed findings of fact and defendants' response reveal the following undisputed facts material to plaintiff's First Amendment claim.

## UNDISPUTED FACTS

### A. *The Parties*

Defendant City of Madison is a Wisconsin municipal corporation. Defendant City of Madison Fire Department is a fire department organized under Wisconsin law. Defendant City of Madison Police and Fire Commission is a city commission organized under Wisconsin law. Defendant Debra H. Amesqua is Fire Chief for defendant City of Madison. Defendants Alan Seeger, Margaret MacMurray, Byron Bishop, Lynn Hobbie and Mario Mendoza are members of defendant City of Madison Police and Fire Commission. Defendant "ABC Insurance Company" is the presently unknown firm that provides insurance coverage to defendant City of Madison. Plaintiff Ronnie B. Greer was employed as a firefighter with the City of Madison Fire Department from February 4, 1981, until July 31, 1998, when he was terminated by order of the police and fire commission.

### B. *Events Leading to Plaintiff's News Release*

In January 1996, defendant Amesqua was hired as the new chief of the department. Shortly after her appointment, Amesqua promoted Marcia Holtz from lieutenant to Division Chief in Charge of Training. On October 3, 1996, a local television station broadcast a fire training session as part of a story about the training of Madison firefighters. In the report, Holtz is seen to shove, hit and yell at a recruit named Ron Cato.

Although the propriety of Holtz's conduct towards Cato was not a topic of the television report, members of the department who happened to watch the news program questioned Holtz's behavior. In a letter dated November 11, 1996, the president of the local firefighters union, Lt. Joseph P. Conway, asked Amesqua to order an independent investigation by the City of Madison attorney because he believed that Holtz's conduct had violated several department rules. Conway advised Amesqua that he had spoken to other recruits and that his conversations led him to believe that Holtz had treated other recruits in the same way she treated Cato. Conway urged that Holtz be suspended during the investigation. In response, Amesqua assigned Assistant Chief Bill Spohn to investigate Holtz's conduct.

Amesqua released her findings on the Holtz investigation in an internal memorandum dated April 9, 1997. In the memorandum, Amesqua notes that Holtz had reported that she was uncomfortable with her treatment of Cato because she had never taken such extraordinary measures. On the basis of this statement and other facts, Amesqua found that Holtz's actions were "not unreasonable under the totality of the circumstances," although she extended Holtz's probation by six months and ordered her to participate in a leadership class.

### C. *Plaintiff's News Release*

On April 28, 1997, approximately three weeks after Amesqua released the internal

memorandum, plaintiff issued a "news release" that reads in full as follows:

### News Release

### Homosexual Chief rewards Homosexual Chief for Assault?

Fire Chief Debra Amesqua issued a decision on the investigation of an incident involving Training Chief Marcia Holtz and a fired firefighter trainee. In the incident, recorded by WMTV News–15 in October 1996, Chief Holtz shoved and screamed at the trainee during a training exercise. An investigation was ordered and a decision based on the investigation was issued on April 9, 1997. It is Chief Amesqua's conclusion that the "questionable measures" (shoving & screaming) used by chief Holtz were not "unreasonable," and that she simply "needs further guidance and training." That training is to be accomplished by "attending an advance leadership class," a training program which is coveted by other chief officers to the extent that there is a "waiting list" to get in! She has also called for a 6 month extension of chief Holtz's probationary period, something she (Chief Holtz) herself appears to have suggested. Now this would be laughable [if] it were not such a serious matter. A senior officer in essence, physically and verbally assaults an employee and Chief Amesqua finds that "not unreasonable" and that her screaming was "professional in content and germane". In over 17 years of firefighting with both experienced and non-experience[d] firefighters, I don't believe I've ever seen a situation where it was necessary to physically assault anyone to get their attention or to instruct them. Granted it is often necessary to make physical contact in a fire situation to initiate communication with another firefighter, but never to the extent as we have seen in this incident. So what's so special or different about this case?

I said in October that this matter would be "down played", "swept over" and nothing significant would be done about it. A lot of my fellow firefighters doubted my "prediction." Well, time has "told the story." One does not need to be a prophet, just someone willing to see things as they are.

Consider the following. One would think that if you wanted to achieve clear facts in investigating a matter of this type it would be only proper to have that investigation done by an independant, disinterested party. However, that is not the case here. The investigation was done by another Division Chief who is subordinate to Chief Amesqua and a staff member with Division Chief Holtz. Is it possible that the investigating officer could have been unduly influenced? Or could the conclusions of the investigation be simply disregarded without opposition by that subordinate?

The relationship between Chief Amesqua and Chief Holtz goes back a ways, namely through their affiliation with an organization called "Women In Fire [Service]", an organization seen by most firefighters in this area as a predominatly homosexual organization. Is it possible that some favoritism has been shown here to a fellow member or possible friend?

Both are homosexual women, who have been seen in the past (and still now among many), with clear agendas as it is concerns women in the fire service. Could it be that their radical agendas has come to play to the extent that even violence can be excused as "glossed over," or in this case, rewarded? Sounds a lot like the much assailed "good-ol-boy" system revived, repainted and given another name.

Now, I'm confused and maybe someone could make sense of this for me; It's not okay to communicate verbally my views on a department chief officer's handling an issue but it's okay to use physical force to communicate with a trainee? Maybe I'm missing something! The department/city is willing to spend thousands of dollars on a case of an alleged comment without proof, on alleged harassment without a complaint or proof, and on an alleged rule violation without action or proof, but "winks" at and rewards physical assault?

Another firefighter is given a disciplinary letter and has the same placed in his employment file because he made a remark regarding homosexuals. He was "off-

duty" and happened to stop by the fire station. A letter of discipline?

A fire officer is facing a 12 hour suspension for angrily making comments to a uniform delievery driver whom he is familiar with. A 12 hour suspension?

But yet, it's not unreasonable for a chief officer in anger to physically handle an employee? Imagine if it were a white male chief officer showing and screaming at a female recruit. Heads would have rolled! So much for fair treatment and equity! Go figure.

Oh, by the way, that male trainee who was the victim, he was mysteriously "let-go" literally days before graduating from the fire academy. Makes you go, "Hmm."

/s/ Just sharing my thoughts with you all.

The case of alleged sexual harassment plaintiff mentions in the seventh paragraph is one involving his distribution of anti-gay literature entitled "Homosexuality: The Truth." (Disciplinary charges in the matter were initiated against plaintiff by Amesqua in December 1996.) Also, it is worth noting that Amesqua has not revealed her sexual orientation publicly.

Portions of plaintiff's news release were quoted in a May 1, 1997 article in the *Capital Times,* which states, in part:

### Greer says fire chief plays gay games

Raps treatment of woman
in shoving incident

\*    \*    \*    \*    \*    \*

Madison firefighter Ron Greer has lobbed another Molotov cocktail at his boss, this time accusing Fire Chief Debra Amesqua of meting out lax discipline to a female assistant fire chief.

He also insinuates that it's a lesbian conspiracy.

In a press release titled "Homosexual chief rewards homosexual chief for assault?" Greer implies that Amesqua showed favoritism in an investigation of Assistant Chief Marcia Holtz.

Holtz was accused of using excessive force on a recruit during a live fire training exercise last October.

Neither Amesqua nor Holtz has said anything publicly about their sexual orientations, whether they're gay or straight.

The discipline for Holtz, recently made public, is a six-month extension of Holtz's probation and a requirement that she attend an advanced leadership class. Greer criticizes the sanction, saying that getting to attend a leadership class is a highly sought-after perk, not a penalty.

\*    \*    \*    \*    \*    \*

Greer, a pastor of a conservative Christian church, has become an anti-gay crusader. He has attacked the chief publicly ever since she came to Madison in January 1996.

Saying Amesqua was unqualified, Greer carried a protest sign when she was sworn in.

Greer himself is facing discipline for insubordination and for handing out anti-gay literature at work. The Madison Police and Fire Commission held roughly 20 hours of hearings on Greer's case and is expected to rule in a few months.

Holtz provided the spark for the latest Greer–Amesqua flap.

\*    \*    \*    \*    \*    \*

### D.    *The Department's Response*

Following plaintiff's issuance of the news release, Amesqua initiated an investigation into whether plaintiff had violated department rules. She directed Assistant Chief Carl Saxe to conduct a pre-determination hearing. Saxe reported to Amesqua that in his view, plaintiff had violated various department rules.

In a letter dated June 10, 1997, Amesqua informed plaintiff that she believed he had committed rule violations that included disseminating a communication with the intent to discredit supervisors and the department and violating the department's rule against harassment of employees on the basis of sexual orientation. Amesqua asked for plaintiff's resignation and told him that if he did not resign, she would seek his termination before the police and fire commission.

Plaintiff did not resign and Amesqua filed charges. After extensive hearings, the com-

mission concluded that plaintiff's dissemination of the news release violated department rules and that his termination was warranted. In a decision dated July 31, 1998, the commission ordered that plaintiff be discharged.

## OPINION

### A. Preliminary Injunction Standard

The standard applied to determine whether plaintiff is entitled to preliminary injunctive relief is well established.

A district court must consider four factors in deciding whether a preliminary injunction should be granted. These factors are: 1) whether the plaintiff has a reasonable likelihood of success on the merits; 2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; 3) whether the threatened injury to the plaintiff outweighs the threatened harm an injunction may inflict on defendant; and 4) whether the granting of a preliminary injunction will disserve the public interest.

*Pelfresne v. Village of Williams Bay,* 865 F.2d 877, 882 (7th Cir.1989). The plaintiff must show some likelihood of success on the merits and that irreparable harm will result if the requested relief is denied. If the plaintiff makes both showings, the court then moves on to balance the relative harms and public interest, considering all four factors under a "sliding scale" approach. *See In re Forty–Eight Insulations, Inc.,* 115 F.3d 1294, 1300–01 (7th Cir.1997).

### B. Irreparable Harm

At the outset, defendants argue that plaintiff's motion must be denied because he cannot satisfy the second threshold of establishing irreparable harm. It is plaintiff's contention that because his discharge implicates First Amendment rights, irreparable harm must be presumed if he succeeds in demonstrating a likelihood of success on the merits of his free speech claim. In support, he relies on the Seventh Circuit's and the Supreme Court's decisions in the *Elrod v. Burns* litigation. *See Burns v. Elrod,* 509 F.2d 1133 (7th Cir.1975), *aff'd sub nom. El-*

*rod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

*Elrod v. Burns* involved several former employees and one current employee of the Cook County, Illinois sheriff's department who alleged that they had been discharged or were under a threat of discharge solely because of their political affiliation. After an election, the new Democratic sheriff decided to remove Republicans from the department or force them either to join or sponsor the Democratic Party. *See Burns,* 509 F.2d at 1134–35. The district court denied the employees' request for preliminary injunctive relief after determining that back pay provided an adequate legal remedy; in other words, there was no irreparable harm.

The court of appeals rejected the district court's reasoning, ruling that more than a loss of employment was at stake: "Inasmuch as this case involves First Amendment rights of association which must be carefully guarded against infringement by public office holders, we judge that injunctive relief is clearly appropriate in these cases." *Burns,* 509 F.2d at 1136. When the Supreme Court took the case, it agreed with the court of appeals' assessment that the employees had experienced irreparable harm. The Court stated: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod,* 427 U.S. at 373, 96 S.Ct. 2673.

Plaintiff contends that the rationale of *Elrod v. Burns* applies in this case and that he is not required to make any showing of irreparable harm. In his view, this court should concentrate on the merits of his claim. If he demonstrates a likelihood that his First Amendment rights have been violated, he is entitled automatically to a presumption of irreparable harm curable by an order requiring his reinstatement.

Defendants contend that plaintiff misinterprets the Supreme Court's decision in the *Elrod v. Burns* litigation and ignores later case law. According to defendants, *Elrod v. Burns* was a special case because it involved politically motivated discharges. They argue that in *Elrod,* the Supreme Court did not establish a rule that irreparable harm is presumed to exist in *all* employment discharge

cases implicating First Amendment issues. Defendants support their argument with cases from other circuits decided after *Elrod* that hold as a general matter that no irreparable harm existed because back pay was an adequate remedy.

Defendants' strongest case is *American Postal Workers Union, AFL—CIO v. United States Postal Service*, 766 F.2d 715 (2d Cir. 1985), because it addresses *Elrod* directly. After the postal service announced job cuts at his branch, an employee wrote to a local customer and told the customer that its mail was being delayed because of the job cuts. The postal service found that the employee had violated regulations and discharged him. Although the discharge was to be tested in arbitration, the employee would not receive pay pending the outcome of the proceeding. His union moved for a preliminary injunction in federal court seeking to stay the discharge until the arbitration was completed, allowing the employee to continue to collect his salary. The district court granted the injunction. *See id.* at 717–19.

On appeal, the Second Circuit reversed the award of injunctive relief on the ground that the plaintiff had not shown he would experience irreparable harm. It is significant that the court rejected the union's argument that *Elrod* established a presumption of irreparable harm in First Amendment claims. *See id.* at 722. The court read *Elrod* to require the party seeking injunctive relief to produce evidence showing that First Amendment interests were " 'threatened or in fact being impaired at the time relief [is] sought.' " *See American Postal Workers*, 766 F.2d at 722 (quoting *Elrod*, 427 U.S. at 373, 96 S.Ct. 2673). Finding that neither the employee's First Amendment rights nor the rights of his fellow employees who remained on the job were in jeopardy during the arbitration, the court of appeals determined that the district court had erred in granting the injunction. *See American Postal Workers*, 766 F.2d at 722; *see also Rendish v. City of Tacoma*, 123 F.3d 1216, 1226 (9th Cir.1997) ("In this circuit, no presumption of irreparable harm arises in a First Amendment retaliation claim ...."); *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir.1989) ("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits."); *but see Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir.1989) (rejecting argument that monetary damages and reinstatement are adequate to remedy harm caused by infringement of First Amendment rights). In addition to this case law, defendants rely on logic: while a discharged employee waits for trial, his or her First Amendment rights to speak out are not in jeopardy because the employer has no power to sanction the employee.

Plaintiff replies that the cited cases and arguments are of no moment. Indeed, he concedes that the Second Circuit's decision in *American Postal Workers* is squarely against him. He argues, however, that because the Seventh Circuit has not voiced a similarly restrictive view of the Supreme Court's decision in *Elrod*, this court remains bound to a broad view of *Elrod*, under which a showing of infringement of First Amendment rights results automatically in a presumption of irreparable injury in any type of employment case, not just one involving political employment.

Defendants' arguments concerning *Elrod* are persuasive, but plaintiff is correct that a broad view of *Elrod* is still the rule in the Seventh Circuit. The only Seventh Circuit case that touches on this element of *Elrod* is *Shondel v. McDermott*, 775 F.2d 859 (7th Cir.1985), in which the court intimated that there might be limits to *Elrod* but chose not to rule on the question. Two employees complained that they were discharged for their political affiliation in violation of First Amendment and sought injunctive relief requiring their reinstatement. The court of appeals held that the plaintiffs were not entitled to such relief on other grounds, avoiding the issue of irreparable harm altogether. *See id.* at 866.

■ Nonetheless, the court of appeals made two important observations:

> *Elrod v. Burns* holds that a litigant who asks for a preliminary injunction to prevent a deprivation of free speech need not show that he will be irreparably harmed if

the injunction is denied, because "the loss of First Amendment freedoms, even for minimal amounts of time, unquestionably constitutes irreparable injury."

*Shondel,* 775 F.2d at 866–67 (quoting *Elrod,* 427 U.S. at 373, 96 S.Ct. 2673). Also, in a latter part of the opinion, the court said:

> The waiver by the Supreme Court in *Elrod* of proof of irreparable harm in preliminary-injunction cases under the First Amendment rests on the view that the balancing of equities that is undertaken in a conventional equity case is out of place in dealing with rights so important as the modern Supreme Court considers the rights of expression to be.

*Id.* at 869. There is only one conclusion that can be gleaned from *Shondel* and from the lack of any case to the contrary: the Seventh Circuit continues to interpret *Elrod's* waiver of the requirement to make an explicit showing of irreparable harm as applicable in all types of First Amendment discharge cases.

It is true that *Shondel* recognizes that neither court in the *Elrod v. Burns* litigation discussed the remedy of immediate reinstatement, as contrasted with preventing a threatened discharge, and that *Shondel* hints that a claim for reinstatement may be different from a claim to stave off a threatened discharge (the difference being related to the accepted principle that a preliminary injunction should preserve the status quo pending final resolution of the law suit). *See id.* at 867. But *Shondel* does not express any holding to such effect. Accordingly, this court is bound by the broad construction of *Elrod* advocated by plaintiff. If he meets his other threshold burden of probability of success on the merits, he is entitled to a presumption that he has been harmed irreparably.

### C. *Success on the Merits*

■ Not every work-related utterance of a public employee is protected by the First Amendment. In *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Supreme Court held:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of only personal interest, absent the most

unusual circumstances, a federal court is not the appropriate forum to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

However, when a public employee does speak on a matter of public concern, *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), holds that the First Amendment protects the employee from discipline, provided the employee's interest in expressing such views is greater than the state's interest in regulating employee conduct so that services are delivered efficiently and effectively. *See Waters v. Churchill,* 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (citing *Connick,* 461 U.S. at 142, 103 S.Ct. 1684, and *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731).

■ *Dishnow v. School District of Rib Lake,* 77 F.3d 194, 197 (7th Cir.1996), holds that the analysis of free speech and state interests involved in *Connick* and *Pickering* proceeds in a three step sequence.

1. Would the speech be protected if it were uttered by someone who was not a public employee? This determination is straightforward. For example, a person who is a public employee has no special First Amendment right to falsely shout fire in a theater. *Cf. Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

■ 2. Is the speech a matter of public concern or is it the rumblings of a "disgruntled employee whose statements are primarily of personal interest?" *See Colburn v. Trustees of Indiana University,* 973 F.2d 581, 585 (7th Cir.1992) (citing *Connick,* 461 U.S. at 147, 103 S.Ct. 1684). The nature of the employee's speech is a legal question to be answered by the trial judge. *See Marshall v. Porter County Plan Comm'n,* 32 F.3d 1215, 1219 (7th Cir.1994). The judge must determine whether the speech can be "fairly characterized as constituting speech on a matter of public concern," after looking at the "content, form and context of a given statement, as revealed by the whole record." *See Connick,* 461 U.S. at 146, 147–48, 103 S.Ct. 1684.

Seventh Circuit precedent fleshes out *Connick's* content, form and context guideline. The court has held that content is the most important factor, *see Campbell v. Towse*, 99 F.3d 820, 827 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1254, —— L.Ed.2d —— (1997), and that the speaker's motive is relevant. *See Linhart v. Glatfelter*, 771 F.2d 1004, 1010 (7th Cir.1985). Specifically, *Linhart* teaches that the aim is to determine the speaker's "point." *See id.*

■■■■ 3. Do the employee's free speech interests in voicing his views outweigh the government's interest as an employer in ensuring that employee discourse does not hamper the efficient delivery of governmental services? *See Wright v. Illinois Dept. of Children & Family Services*, 40 F.3d 1492, 1502 (7th Cir.1994) (citing *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). This determination is another legal question for the trial judge. *See Campbell*, 99 F.3d at 826. The burden is on the government to establish the greater weight of its interests. *See Glass v. Dachel*, 2 F.3d 733, 744 (7th Cir.1993). In the balancing, the judge must determine whether the public employer has established a "convincing reason" for having taken action against the employee's speech. *See Dishnow*, 77 F.3d at 197; *see also Brown v. Disciplinary Committee of Edgerton Volunteer Fire Dept.*, 97 F.3d 969, 972 (7th Cir.1996).

■■■■ A number of criteria are considered in undertaking the *Pickering* balance: (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among coworkers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. *Wright*, 40 F.3d at 1502. The balancing of these seven criteria in the third step may

overlap the analysis of content, form and context undertaken to determine whether the speech was a matter of public concern in the second step. *See Hesse v. Board of Education of Township High School District No. 211*, 848 F.2d 748, 752–53 (7th Cir.1988) (context in which dispute arose is factor in balancing); *Cooper v. Smith*, 89 F.3d 761, 765 (11th Cir.1996) (context and circumstances are considered "again" when balancing); *but see Hesse*, 848 F.2d at 757 n. 7 (Flaum, J., dissenting) (warning against collapse of *Connick's* public concern determination into *Pickering's* balancing).

■■■ Once the public employee has taken all three steps and the trial judge is persuaded that the employee's speech touches on a matter of public concern and that the balance of interests points in the employee's favor, usually there is the separate task of determining whether the employee's speech led to the discipline. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In this case, however, it is not contested that plaintiff's news release was the cause of his discharge. Also, in some cases there is the related and sometimes difficult task of identifying which element of the employee's speech led to the discharge. *See Wright*, 40 F.3d at 1500. In this instance, however, there is no need to parse plaintiff's news release because defendants do not argue that he was discharged for only some of the things he said in the news release.

Plaintiff breezes through the first step of the analysis. There can be no dispute that his news release addresses matters that would be entitled to First Amendment protection if he had not been working for the department when he issued it.

■■■ Whether plaintiff meets the second step is disputed. According to plaintiff, the main point of his news release was to disclose to the local public "unlawful favoritism" on the part of Amesqua. *See* Supp.Br. of Pl. in Supp. of Mot. for Prelim. Inj., dkt. # 12, at 5–6. (Although the police and fire commission's determination on this matter is immaterial in this lawsuit, plaintiff emphasizes that the commission treated the news release

as a matter of public concern.) Additionally, plaintiff says that he was disclosing to the public the related matters of Amesqua's "whitewash[ing] of 'the Cato incident' and her 'stonewalling' of intradepartment efforts to determine the extent of Holtz's behavior, including Lt. Conway's request that Amesqua investigate complaints about Holtz by other recruits". *See* Brief of Pl. in Supp. of Pet. for T.R.O., dkt. # 4, at 10–12. At a glance, the title of the news release and discussion of Amesqua's sexual orientation appear out of place in a news release intended to expose errors in her professional judgment, suggesting that plaintiff included the remarks about sexual orientation to humiliate Amesqua and make the news release titillating. However, plaintiff justifies the reference on the basis that it supplies a possible reason for the display of favoritism to Holtz. *See id.* at 17. Finally, plaintiff concedes that the news release discusses the charges brought against him by Amesqua, but he argues that he ad-led the discussion of his own experience only as another example of Amesqua's poor judgment.

In support of the contention that his news release reveals a matter of public concern, plaintiff relies on *Biggs v. Village of Dupo,* 892 F.2d 1298 (7th Cir.1990). Biggs was a police officer who complained during an interview with the local newspaper about the department's inadequate funding and wrongful interference by village officials. Biggs made a statement to the effect that local officials were "criminals" and discussed his own problems with local officials, including his being turned down for promotions. *See id.* at 1299–1300. Biggs's speech was found to be a matter of public concern because it was directed mostly at the department's lack of funds and interference by village officials in police matters and because his complaints about the treatment he received were merely an example of the department's problems. *See id.* at 1301–02.

If there is such a thing as a "classic" matter of public concern, exposure of wrongdoing by public officials would be it. Exposing a fire chief's alleged favoritism toward a subordinate officer falls into this category. Indeed, defendants agree that the *topic* of Amesqua's alleged favoritism is a matter of public concern. However, they argue that there is a personal angle to the news release that is controlling: the news release is not protected speech because it simply is a continuation of an "ongoing personal dispute" between plaintiff and Amesqua.

At this preliminary stage, the determination whether plaintiff's news release is a matter of public concern turns on the adequacy of the factual record. True, the newspaper articles the parties have placed in the record describe Greer's long-running "flap" with Amesqua. They report that plaintiff is vehemently intolerant of homosexuality. He believes that homosexuality is a sin, that homosexuals should be discriminated against in jobs and housing, that they should not be allowed to hold positions of public authority and that homosexuals molest children and are the cause of human disease. According to the newspapers, Greer was a lone picketer at Amesqua's swearing-in, challenging her appointment because he believed her to be a homosexual. If all this context were *evidence,* it would be hard for plaintiff to refute defendants' contention that the news release was merely another volley in plaintiff's ongoing feud with Amesqua. But it is not evidence. Despite what the local newspapers say, the present record supports plaintiff's view that his news release was a legitimate attempt to disclose her possible wrongdoing.

Furthermore, when only the content of the news release is considered and not the context, there appears to be merit to plaintiff's argument that he mentioned his personal dispute as but one example of Amesqua's poor decision making. Plaintiff refers not only to his own experiences but also to alleged difficulties that his colleagues have experienced under Amesqua's leadership. He argues that two other firefighters have received discipline harsher that Holtz's although their offenses were not as serious and that recruit Cato left the fire department before graduation, presumably because of undue pressure from department leadership.

Defendants present a separate and distinct but much less developed argument that the discharge of plaintiff did not violate the First Amendment. Although this argument ap-

pears to fall outside the three-step *Connick* and *Pickering* analysis, it depends heavily on an assessment of the content of plaintiff's news release. The "argument" consists primarily of a citation to a passage from *Brenner v. Brown*, 36 F.3d 18, 20 (7th Cir.1994) (per curiam):

> [E]ven if the speech were protected on the basis, *e.g.*, that it involved a matter of public concern, an employee's speech is not protected where it is made with reckless disregard for the truth, or is otherwise profane and disparaging.

Brenner was a Veterans Administration employee who alleged that she was reprimanded and not promoted because of complaints she made about her supervisor in several letters she sent to administration officials, her state senator and United States senator. In one letter, Brenner accused her supervisor of being "the most devious and sadistic person I have ever met." In another letter, Brenner remarked that although her supervisor had been unmarried for five years, she had a three year old daughter; mockingly, Brenner refused to say "who rumor has it the father is." *See id.* at 20.

The court of appeals agreed with the district court's conclusion that any adverse job action taken against Brenner for her statements did not violate the First Amendment for two separate reasons. First, Brenner failed to present a claim under *Connick* and *Pickering* because any adverse job action taken against her was not the result of "any protected speech;" no First Amendment protection exists for speech "that is of an entirely private concern." *See id.* at 20 (citing *Waters*, 511 U.S. at 674, 114 S.Ct. 1878, and *Connick*, 461 U.S. at 146–49, 103 S.Ct. 1684). Expressed another way, Brenner did not meet the second step.

Alternatively, the court of appeals held that Brenner's First Amendment claim was properly rejected pursuant to the passage quoted above, because "even if the speech were protected on the basis, *e.g.*, that is involved a matter of public concern, an employee's speech is not protected where it is made with reckless disregard for the truth, or is otherwise profane and disparaging." *Id.* at 20. The meaning of this one-sentence

holding is not immediately evident. The court of appeals seemed to be suggesting that even if a public employee's speech can be said to be a matter of public concern, if the speech includes remarks that are factually unsupported or that are profane and disparaging, the employee enjoys no First Amendment protection against subsequent disciplinary action. (It could also be said that *Brenner* involves the first step of the *Connick* and *Pickering* inquiry because profanity or speech uttered with reckless disregard for the truth does not generally enjoy First Amendment protection whether it is spoken by a public employee or by a citizen standing on a street corner.)

Assuming that it is correct to interpret *Brenner* to mean that public employees have no First Amendment protection for speech on a matter of public concern if the speech includes reckless or degrading remarks, I am not persuaded that the holding applies in this instance. With respect to plaintiff's recklessness, defendants argue that plaintiff had "no knowledge" of the investigation that Amesqua ordered concerning the Holtz–Cato incident and therefore had no factual basis for his statement that Amesqua "glossed over" the investigation. But they fail to develop their argument adequately. Defendants do not attempt to answer questions such as whether under *Brenner* plaintiff would need to establish that he had first hand knowledge of the scope of the investigation, or whether reliable but second hand knowledge would suffice. In addition, the essential questions of what plaintiff knew and when he knew it are issues of fact on which defendants submitted no proposed findings. (Defendants do not raise it, but it is difficult to imagine that plaintiff had knowledge of Amesqua's sexual orientation either because she has not disclosed it publicly.)

Although I must reject defendants' invitation to apply this aspect of *Brenner*, plaintiff's discussion of Amesqua's sexual orientation is troubling when examined under *Brenner's* disparaging remark rule. In our society, a remark that another person is a "homosexual" can be viewed as degrading. In light of plaintiff's choice of the title "Homosexual Chief rewards Homosexual Chief

for Assault?," and his allegation that because Amesqua and Holtz are gay, they share a "radical agenda," it is hard to accept his contention that he discussed Amesqua's and Holtz's sexual orientation only as a possible reason for Amesqua's display of favoritism toward Holtz. It is even harder to accept his contention if the local newspapers are correct that plaintiff has strong personal beliefs about homosexuality: if a person believes that homosexuality is the cause of human disease, when that person calls someone a homosexual, it can only be viewed as degrading. Although defendants argue that Amesqua's and Holtz's sexual orientation is not a matter of public concern, they acknowledge in their brief that plaintiff's news release "accuses Chief Amesqua of treating another employee differently based on sexual orientation." See Defs.' Br. in Opp'n to Pl.'s Mot. for Prelim. Inj., dkt. # 16, at 41. They do not argue that plaintiff's speculation about Amesqua's and Holtz's sexual orientation was intended to be degrading.

■ Although plaintiff meets the first and second parts of the *Connick* and *Pickering* analysis, he is unlikely to progress further, even though defendants bear the burden of proof at the final step. There are two factors that weigh heavily in favor of the fire department, making it implausible that plaintiff can prevail ultimately.

A line firefighter's public criticism of command may disrupt the working relationships among firefighters. Courts have held that firefighting forces cannot be staffed by persons who have "lingering resentment" towards leadership and that the presence of someone perceived as a "trouble-maker" may impair the effective functioning of the force. See *Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17, 27 (2d Cir.1979); *Germann v. City of Kansas City*, 776 F.2d 761, 765 (8th Cir.1985) (fire captain's continued display of hostility to chief during trial confirms that denying him promotion to battalion chief was appropriate) (citing *Janusaitis*, 607 F.2d at 27); *Marshall v. City of Atlanta*, 614 F.Supp. 581, 583 (N.D.Ga.1984) (department's interest in maintaining authority and harmony outweighs line firefighter's interest in abrasive criticism of officers) (citing *Janu-*

*saitis*, 607 F.2d at 26), *aff'd*, 770 F.2d 174 (11th Cir.1985); *see also Shands v. City of Kennett*, 993 F.2d 1337, 1345 (8th Cir.1993) (fire chief's infrequent contact with line firefighter did not lessen department's interest in regulating speech of line firefighters; where fire chief does not closely supervise line firefighters, personal loyalty to chief may be critical). In the news release, plaintiff not only challenges Amesqua's decision making, he comments publicly on her sexual orientation and the orientation of another command officer. At this point, I must assume that plaintiff had a benign reason for talking about this highly personal matter, but that does not negate the fact what he said can have a dramatic effect on departmental operations. No one can question seriously the fire department's need to remove from its ranks a line firefighter who sends a news release to local media that challenges his chief's decision making on an internal personnel matter and speculates about her sexual orientation and that of another command officer.

Plaintiff's decision to spread his views about Amesqua's sexual orientation publicly presented another risk. Although he may have had a reason to discuss Amesqua's and Holtz's sexual orientation, he did not do so in a neutral tone, but instead labeled homosexuality as a radical agenda. If a fire department took no action against a line firefighter who makes such statements, its inaction could convey to gays and lesbians in the ranks of the fire department and in the Madison community that the department is not concerned with their well being. A fire department must be able to take a strong stance against statements that could be perceived as bigotry, not only to preserve good working relationships in the ranks, but also to assure the entire community that it does not discriminate in the delivery of services.

On the other side, plaintiff contends that his new release embodies free speech interests that are two-fold. One, he asserts that Amesqua's favoritism is damaging the department's "integrity" and that as a firefighter, he has an interest in preserving the reputation of his department. Two, he asserts that Amesqua's favoritism is a matter that

can be remedied only through outside intervention. Here, plaintiff relies again on *Biggs*, 892 F.2d at 1298, in which the court of appeals recognized that because employees of a government agency are most likely to have " 'informed' " opinions about the functioning of that agency, " 'it is essential that they be able to speak out freely on such questions without fear of retaliatory [discharge].' " *See id.* at 1303 (quoting *Pickering*, 391 U.S. at 572, 88 S.Ct. 1731). Pursuant to this principle, the court of appeals determined that the free speech interests in Biggs's statements concerning inadequate funding of the police force and interference by local politicians was greater than the state's various interests, including the curtailing of conduct that might impede discipline and harmony. *See id.*

These asserted interests are not enough to tip the balance back in plaintiffs favor. First, accepting that Amesqua's favoritism is damaging the department's reputation, plaintiff's interests in preserving that reputation are at the very least matched by the department's interest in taking a stand against bigotry. Second, the claim that plaintiff is like officer Biggs has no merit. There is a critical distinction between what Biggs said during his interview with the local newspaper and what plaintiff said in his news release: officer Biggs did not challenge the decision making of his supervisors; he challenged only the decision making of village officials. In fact, Biggs complained that village officials did not heed the judgment of departmental officials. He was quoted as saying that his former chief "was smarter than the politicians.... He knew all the aspects about the law." *See Biggs*, 892 F.2d at 1307. Many people have complaints about local politicians; Biggs's complaint was a generalized one to the effect that local politicians did not treat the force properly. Although Biggs's speaking his mind on such a matter might not have helped relations between the village and the police department, his statements gave no indication that he would not follow orders from his supervisors or be able to get along with his fellow officers.

I reject plaintiff's contention that his interest in speaking out about Amesqua's favoritism is greater than the harm that such statements might have on order among the ranks and ultimately on the department's ability to fight fires effectively. In undertaking the balancing in this case, I have given no weight to two additional matters that plaintiff argues should tip the balance in his favor: 1) the "truth" of his comment that Holtz's conduct is considered unacceptable in professional circles and 2) the lack of evidence showing that the news release actually disrupted departmental operations. Plaintiff is wrong in thinking that these factors are material.

The Seventh Circuit does not hold to a principle that especially true statements of public employees receive more consideration in the *Pickering* balance. *See Johnson v. Multnomah County*, 48 F.3d 420, 424–25 (9th Cir.1995) (split of circuits on issue whether recklessness of factual statements is element of *Pickering* balance; Seventh Circuit holds view that reckless statements are not entitled to First Amendment protection per se) (citing *Brenner*, 36 F.3d at 20). Indeed, *Brenner* intimates that a public employee cannot even get to the third part of the *Connick* and *Pickering* analysis if his statements do not have at least a basis in fact. I have rejected defendants' presently undeveloped argument that plaintiff cannot satisfy the second part of the analysis because he had no personal knowledge of the matters discussed in his news release; in other words, defendants have not established that plaintiff is not entitled to First Amendment protection because some of plaintiff's statements in his news release were *untrue.* However, in this circuit, there is no opposite rule that plaintiff's actual knowledge concerning the internal matters he discusses in the news release has bearing on the determination whether it was necessary for the department to take action against him for speaking out on such matters.

Plaintiff's argument that defendants have not presented evidence revealing that his news release actually caused disruption among the ranks may be disposed of swiftly: "The public employer is not required to wait until actual disruption occurs.... Where employee speech carries *the potential* to be

disruptive, the public employer must have the ability to move quickly." *Khuans v. School District 110,* 123 F.3d 1010, 1014 (7th Cir.1997) (emphasis added) (citing *Connick,* 461 U.S. at 152, 103 S.Ct. 1684).

### D. *Summary*

Plaintiff has not met the two threshold burdens necessary to his obtaining preliminary injunctive relief. His ability to establish irreparable harm is linked to his ability to demonstrate a likelihood of success on the merits of his First Amendment claim. On the merits, although his news release may be a matter of public concern, defendants have a strong likelihood of success on their claim that the department's interest in running a department that can serve the public effectively outweighs plaintiff's free speech interests in his news release. Consequently, because plaintiff has not shown a likelihood of ultimate success on the merits of his First Amendment claim, his motion for preliminary injunctive relief must be denied.

### ORDER

IT IS ORDERED THAT the motion of plaintiff Ronnie B. Greer for a preliminary injunction is DENIED.